RANSOME CONCRETE MACHINERY CO. v. UNITED CONCRETE MACHINERY CO.

(Circuit Court, S. D. New York. December 23, 1908.)

PATENTS (§ 328*)—INFRINGEMENT—CONCRETE MIXER.

The Ransome patent No. 814,803, for concrete mixing machinery consisting of a batch-mixing drum, was not anticipated, and discloses patentable invention of quite a high order. It is not limited to the precise device shown, but is entitled to a fairly broad construction. Also *held* infringed.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. Suit to enjoin alleged infringement of patent and for an accounting.

Edward S. Beach, for complainant.
Stephen J. Cox, for defendant.

RAY, District Judge. The patent in suit, and alleged to have been infringed, was issued March 13, 1906, to Ernest Leslie Ransome, on application filed April 1, 1902, for concrete-mixing machinery, and is numbered 814,803. Claims 2, 3, 5, and 7 are in issue, and read as follows:

"(2) A mixer having a revoluble drum adapted to receive material at one end and discharge it at the other, the drum having a centrally-orificed head at the discharge end, a shelf secured within the drum and extending along the inner side thereof diagonally with respect to the axis of the drum, the discharge end of the shelf extending to the head at the discharge end of the drum and forming a pocket in connection therewith, an additional shelf secured within the drum and extending diagonally of the axis thereof across the first-named shelf, and a means extending through the said orifice in the discharge head of the drum, for carrying off the material from the drum.

"(3) A mixing apparatus having a revoluble drum, adapted to receive the material at one end and discharge it at the other end, a lifting shelf secured to the drum against the inner side thereof, the shelf extending diagonally with respect to the axis of the drum for the major portion of the length of the shelf, and said major portion of the length of the shelf being relatively straight, and the shelf terminating at the discharge end of the drum in an offset portion, the concave side of which faces the direction of revolution of the drum, whereby to form a lifting pocket. * * *

"(5) A mixing apparatus having a revoluble drum adapted to receive the material at one end and discharge it at the other end, a shelf secured in the drum against the inner side thereof, the shelf extending diagonally with respect to the axis of the drum for the major portion of the length of the shelf, and the shelf terminating at the discharge end of the drum in an offset portion, the concave side of which faces the direction of revolution of the drum, whereby to form a pocket, and an additional shelf secured in the

drum and extending diagonally of the axis thereof across the first-named shelf. * * *

"(7) A machine of the class described, having a revoluble hollow member provided at its discharge end with a head, a plurality of shelves secured to the inside of the member and having offset ends disposed relatively to said head to form a series of lifting pockets adjacent to the discharge end of the revoluble member, and other shelves extending across the first-named shelves."

This is a batch mixer. The inventor in his specifications, says:

"My invention relates to that type of mixers known as 'batch mixers,' in which the material to be mixed is placed into the mixer, a batch or charge at a time, and is in like manner discharged when mixed."

Those who know the character of concrete and its composition, gravel, sand, cement, and moisture, understand the necessity of a quick and thorough mixing and placing of the concrete when so mixed for use. The materials mentioned must not only be put together, but thoroughly intermixed quickly, and then quickly placed in the position for hardening. This batch mixer, in claim 2, calls for the following combination: (1) A revoluble drum having an aperture on the one end for receiving the material after a rough mixing or intermingling, and another aperture on the other or opposite end for discharging it after the real mixing process is completed; (2) this drum has a centrally-orificed head at the discharge end; (3) a shelf secured within the drum and extending along the inner side thereof diagonally, with respect to the axis of the drum, the discharge end of which shelf extends to the head at the discharge end of the drum, and, in connection therewith, forms a pocket; (4) an additional shelf secured within the drum and extending diagonally of the axis thereof across the first-named shelf, and (5) a means extending through the said orifice in the discharge head of the drum for carrying the material from the drum when mixed.

In claim 3 we have: (1) The mixing apparatus, having a revoluble drum adapted to receive the material at one end and discharge it at the other; (2) a lifting shelf secured to the drum against the inner side thereof, and which shelf extends diagonally with respect to the axis of the drum for the major portion of the length of such shelf, such major portion being relatively straight; and (3) said shelf terminating at the discharge end of the drum in an offset portion, the concave side of which offset portion faces the direction of the revolution of the drum whereby to form a lifting pocket.

Claim 5 has the mixing apparatus having the revoluble drum adapted to receive the material at one end and discharge it at the other, which means there is an aperture in each end of the drum; (2) a shelf secured in the drum against the inner side thereof, which shelf extends diagonally with respect to the axis of the drum for the major portion of the length of the shelf and then terminates at the discharge end of the drum in an offset portion, the concave side of which faces the direction of the revolution of the drum, whereby to form a pocket, and a second or additional shelf secured in the drum and extending diagonally of the axis thereof across the first-named shelf.

Claim 7 calls for a machine of the class described, having (1) a revoluble hollow member, provided at its discharge and with a head;

(2) a plurality of shelves secured to the inside of the member and the shelves, having offset ends, disposed relatively to said head to form a series of lifting pockets adjacent to the discharge end of the revoluble member; and (3) other shelves extending across the first-named shelves.

Claim 2 has two shelves, crossing each other; claim 3 only one, but this has an offset portion; claim 5 has two shelves crossing each other; and claim 7 has a plurality of shelves with offset portion and other shelves extending across them. In each we have a revoluble drum or hollow member with opposite heads, each of which has openings, the openings being substantially opposite each other, one of which is for receiving, and the other for discharging, the concrete. In each we have a shelf, or a series of shelves, diagonally arranged, with reference to the axis of the drum, fastened to the heads and extending along the inner side of the drum from head to head on its periphery, and in all but claim 3 we have a shelf or series of shelves set diagonally with reference to the axis and set reversely to the first-mentioned shelves. These are set on the upper or inner edges of the first shelves or so as to rest thereon and extend part way from head to head; that is, part way from the discharge head to the receiving head. The "means" extending through the orifice in the discharge head of the drum is for carrying off the mixed concrete, and consists of a short discharge chute pivotally mounted at the discharge end of the drum so that its upper end may be inserted into the drum through the opening mentioned and receive the mixed concrete as it falls from the pockets when they reach the upper part of the drum on the discharge side, and, in consequence of being bottom side up, are in a dumping position. The discharge of thoroughly mixed concrete is continuous after the chute is inserted, if the drum is continued in motion. When the mixed batch is fully discharged, the chute is turned in its pivot so that it no longer enters the drum. Then another batch is put in at the receiving end of the drum, and the mixing of that batch proceeds until ready to be discharged, when the chute is turned into position and the revolution of the drum continuing the discharge process commences and continues until the drum is empty and ready for another batch.

The mixing process within the drum, including the transfer of the mixed material from one side to the other, is substantially as follows: The materials forming the concrete are heavy, and, as the shelf or shelves next the periphery of the drum is each set diagonally with reference to its axis, the moment the drum begins to revolve the unmixed concrete is carried forward and upward, and slides on the diagonally set shelf from the receiving end towards the discharge end and into the pockets, so far as their capacity will permit. So long as the concrete is being carried forward and upward, these act as lifting pockets, as do the first set of shelves or the shelf first mentioned. At a certain height it is evident the concrete materials will begin to fall out of the pockets and off the shelf or shelves, and mix or mingle with that below, and that the same pockets, the lifting pockets, then become discharging pockets. As the tendency of the

concrete actually carried in the pockets and on the shelf or shelves next the periphery is all the time to slide towards the discharge end, it is evident that the whole mass will eventually be carried to that end and dropped, and, when the chute is in position, caught by the chute and discharged from the drum. This operation of discharging does not begin, however, until the whole batch is thoroughly mixed. As the drum revolves, the whole mass is carried forward and lifted to an extent, but that in position in front of the shelf or shelves is lifted and carried forward and upward, moving towards the opposite end of the drum until it falls off the shelves or out of the pockets, depending on where it is. and as it falls upon that below, and even as it falls, the materials being of a different specific gravity, the mixing operation is constantly going on. Now, by adding the second shelf or series of shelves above the first and extending them part way across the drum, from end to end, and diagonally across the first shelf as mentioned, the falling materials are caught and carried in part and in part thrown and scattered, the tendency being to move them back towards the receiving end of the drum; but these second shelves or this second shelf only extend part way, as it is desirable to prevent clogging, and especially to have the thoroughly mixed ingredients carried into the lifting and discharging pockets so as to be discharged through the chute after that operation commences. Hence the inner shelf or shelves must not or should not extend to the receiving end of the drum. The further the mixing process proceeds, the more plastic and slippery the whole mass becomes. It is perhaps unnecessary to mention that mixed concrete or moistened cement hardens quickly, and that it is essential that the shelves and pockets be so constructed and arranged that no part of the mixed concrete shall remain in the drum. Hence the absence of retaining nooks and corners is desirable and essential to a successful mixer. Every mason knows this, and is careful to prevent accumulations in the corners of the ordinary stationary mixing boxes. It is also desirable that each end of the drum have a solid head sufficient to retain the concrete while the mixing is going on, and still have openings for receiving unmixed batches and discharging the mixed ones. It is also essential or desirable that the pockets be next the discharge end and easily reached for cleaning. That this device is easily handled and efficient in operation cannot be questioned. The patent or application for the patent was thoroughly considered in the Patent Office, as appears from the file wrapper in evidence. The defendant claims that complainant is limited by the action of the Patent Office to the details of construction shown, and that, so limited, defendant does not infringe; also that the claims of the patent in suit are clearly anticipated by the prior art. Some 19 patents are cited to show the prior art. The Ransome patents of 1885, No. 322,006, and of 1889, No. 410,292, and Hotchkiss patent of 1890, No. 441,563, and Smith patent of 1902, No. 690,783, are all for concrete mixers, but the Hotchkiss and Smith patents are for continuous mixers; that is, the materials are continuously fed into the one end of the mixer and continuously discharged mixed at the other end. The other patents relate to coffee and tea mixers, rotary

sieves, carrying devices, etc., and would be utterly useless and inoperative as concrete mixers if enlarged and made stronger. A revoluble drum with some sort of lifting shelves and short shelves so formed and attached as to form pockets were not new in the art. See Fig. 1, patent No. 322,006, of July 14, 1885, to E. L. Ransome. Here he has what he calls directing guides or flanges, and also oscillating or adjustable lifting flanges used solely for discharging the material. He says, among other things:

"My invention relates to that class of machines in which a rotating casing is employed to receive and mix the materials to form concrete; and my invention consists in a hollow rotating drum provided with side apertures, and having upon the inner surface of its periphery peculiar directing guides or flanges and oscillating or adjustable shelves or flanges for the purpose of lifting the materials as the drum revolves. Extending transversely and at an inclination through the drum is a discharge chute or spout supported independently of the drum by suitable standards or hangers, and provided with a swinging end gate. A small and independent hopper or chute and a platform in connection with the hopper are employed to facilitate the feed to the drum. Secured to and under the transverse spout is a pipe, perforated throughout its length, whereby water is introduced within the drum.

"The object of my invention is to provide a simple and effective machine for mixing concrete. * * *

"Upon the inner surface of the periphery of the drum are secured the angling or approximately V-shaped directing-flanges F. These in cross-section have the shape of a right-angle triangle approximately, the hypotenuse facing the direction of rotation of the drum. These flanges may be arranged in any suitable series with relation to one another, the principle idea, however, being that the apex of one flange should be adjacent to the opposite flange; that is to say, that each pair of flanges or each set should be bent in opposite directions. I prefer the arrangement shown in the drawings, where the main flanges are bent in opposite directions, the spaces behind and between them being filled in by smaller angular flanges, also bent in opposite directions. The purpose of this arrangement I shall presently describe.

"G are the lifting shelves or flanges. These consist of oblong plates mounted upon oscillating shafts, g, journaled transversely in the drum, and adapted to be moved by means of a handle-lever, g', on their outer ends, which engages with a rack, g2, on the outer surface of the side of the drum. By moving the handle, g', the flanges may be made to lie down close to the surface of the drum, or they may be moved to extend inwardly at a suitable angle to enable them to lift the material. There may be any number of these lifting-flanges within the drum, though I think it best to have about four. H is a small feed chute or hopper supported independently of the drum, and extending slightly within it, and h is a platform upon which a wheelbarrow containing the material to be mixed can be pushed, whereby its load can be dumped into the directing-chute H, from which it is delivered to the drum.

"The operation of the machine is as follows: The drum is rotated by the mechanism described. The material to be mixed is delivered to the drum through the chute H, and water is also delivered through the perforated pipe E. The lifting-flanges G are turned to lie as flat as possible, so that they do not interfere with the mixing process, their function being merely one of discharging into the chute D. The material meeting the directing guides or flanges (the sloping sides of which lie in the direction of revolution, thereby avoiding any lifting function) is first directed to the center and then toward the sides of the drum, according as it meets the oppositely-bent flanges. In this way the various materials are thoroughly mingled, no one being allowed to keep to itself. When they have become thoroughly mixed, the material is picked up by the lifting-flanges G, which are turned inwardly to the proper angle. Small quantities are lifted by these flanges, and are discharged above into the spout D, down which the material runs or passes by its own gravity, and is discharged through the swinging gate, d'."

It is self-evident that this is not the concrete mixing machine of the patent in suit, although it has some of the elements, and that the operation is quite different. There was room for much improvement, as is seen by comparing this patent of 1885 with the one now in question.

In Ransome's patent of September 3, 1889, No. 410,292, he says:

"My invention relates to improvements in that class of machines in which a rotating case is employed to receive and mix the material to form concrete, and it is especially applicable to a machine patented to me July 14, 1885, in which a series of lifting shelves or flanges are fitted within the rotary casing of the mixer.

"My invention consists of an automatically-operating device by which the shelves or flanges may be turned upon their pivot or fulcrum pins, so as to either lie flat or stand, so as to discharge the material when properly mixed.     *     *     *

"A is a hollow drum having openings at each end through which the material is introduced to and discharged from the annular space around the circumference within which the mixing is carried on.     Angularly-placed flanges are fitted within the drum for the purpose of mixing the material, and a discharge-chute is supported so as to extend through the drum in such a manner as to receive and discharge the material when properly mixed.     The material is lifted to a point where it can be dropped into this chute by means of the shelves or flanges G, which consist of oblong plates mounted upon shafts H, about which they may be turned, so as to lie in a position in which they will not lift the material until it has been properly mixed within the drum.     They may then be turned to stand at such an angle that they will lift the material and carry it up to a point above the discharge-chute into which they will drop it.

"Upon the end of each of the shafts H is fixed a double-lever arm I, so that by turning this arm the shaft and the lifting-plate are moved as above described.     Upon each end of this lever-arm I are pins J, which project inwardly or toward the side or flange of the drum A.     Upon this side of the drum are fixed the two springs K, having the holes L made in them, as shown. These springs have one end each bolted or fixed to the side of the drum, and they are made so as to incline outwardly from the point where they are fixed, and shoulders M are formed in the springs, where they are again bent abruptly inward toward the side of the casing.     These shoulders insure that the springs will be depressed. so as to clear the pins before the levers are moved.     From this point the ends of the springs extend a short distance beneath the lever-arm I, and their elasticity causes them to be pressed against the inner faces of the levers.     It will be seen that when the lever I of either of the lifting shelves or flanges is turned so that one of its pins J will drop into the hole L in the corresponding spring, which is beneath that end of the lever, the lifting-flange and lever will be rigidly held in that position until it be released from the spring.     *     *     *

"The operation will then be as follows: The lifting flanges or shelves lying flat or in a position not to lift the material which is being mixed within the drum, the pin J at one end of the lever I will be engaged by the hole L in the corresponding spring K, and will thus be locked in that position, where it will remain as long as may be desired.     Whenever it is desired to turn the flange into a position where it will lift the material so as to drop it into the discharge-spout, the pin Q will be advanced by moving the lever O, and as the drum A continues to revolve this pin will engage the inclined portion of the spring K and gradually force the spring inward until the pin J is released from the hole L. The end of the pin Q, then passing over the shoulder or offset M, strikes the end of the arm I and turns this arm, and with it the shaft H and the lifting flange or shelf within the drum, to a position which will cause it to act to lift the material within the drum. The pin J, upon the opposite end of the lever I, will then engage with the hole L upon the opposite spring K, and will hold the flange in that position as long as may be desired. When it is desired to release the lifting-flange and allow it to be turned

into the position in which it will not lift, the lever O is moved so as to advance the pin P, and this, following the inclination of the other spring K, will force that spring inward until it is clear of the pin J of the lever I at that end. The continued movement of the drum A brings the pin into contact with that end of the lever I, thus turning it in the opposite direction until it is again locked with the other spring, as previously described. At the instant when this locking takes place the lever I is turned so far out of line as to allow the pin P or Q to pass by its end without further action upon it. The shoulders or offsets M upon the springs K are deeper than the length of the pins J, so that as they pass beneath the pin P or Q they will be depressed so far that the pins J will be entirely released from the locking-holes L before the end of the lever I is engaged and moved by the pin P or Q."

It is self-evident that this is not the device of the patent in suit.

Turning to the claims of the prior Ransome patent, it is self-evident that they differ from and do not cover the combination of the claims of the patent in suit.

Turning now to the Hotchkiss patent of November 25, 1890, No. 441,563, we find a portable frame carrying a pair of inclined rotary cylinders, elevators and hoppers for conducting the different materials which form the concrete to the entrance of the cylinders, the water pipe leading into and adapted to discharge water into one of the cylinders, and an engine and boiler for operating and propelling the machine.

This complex machine has two inclined mixing cylinders provided with longitudinal spiral flanges fixed to their inner wall surface and the patentee says:

"The spiral flanges of the cylinders are for the purpose of assisting in the mixing by carrying the materials partially about with them as they rotate with the cylinders, and when passing the center line, on the horizontal, permit it to fall, and thereby constantly keep taking the material nearest the bottom and turning it over to the top, thus most thoroughly mixing it. The action of the cylinders is the same without the flanges, but the mixing is more rapid and thorough with them. The object in arranging the said flanges spirally is so that their rearwardly-inclining surfaces, when in operation, will assist in forcing the material rearward, and also to equalize the rising and falling of the material during the mixing, for should they be arranged parallel they would gather a like quantity throughout their length, and when brought to a position at or above a horizontal plane with the axis it would all drop off at once and thus cause an intermittent jerking motion, which is wholly overcome by the arrangement shown and described."

This, in connection with the claims themselves, demonstrates that Hotchkiss neither shows, nor describes, nor claims the device of the patent in suit.

Turning to the Smith patent of January 7, 1902, No. 690,783, we find a concrete mixing machine of which the patentee says:

"The primary object of the invention is to provide a machine not only capable of mixing dry materials with great rapidity and thoroughness, but also of mingling dry and liquid materials to any consistency, or mixing liquids and discharging any desired quantity while the agitating process is going on.

"With the above primary object and other incidental objects in view, the invention consists of the devices and parts or their equivalents, as hereinafter set forth."

Of the drum and blades, the patentee says:

"Within each cone-section of the drum are a series of mixing-blades. In order to make the action of these blades clear, reference is hereby made

particularly to Fig. 4. The blades are shown as divided into sets; but it will be understood that this is not absolutely essential, being only preferably adopted for convenience in construction. Each blade of each set may be flat, although, if preferred, a slight spiral formation may be given thereto. At all events, the three blades shown as composing each set should be so arranged that if composed of a single continuous blade said continuous blade would have a spiral formation. The action of the drum is to give a rolling-over movement to the material, and the blades deflect from the ends toward and past the middle, the rolling-over and alternating transverse motion being simultaneous and effecting a thorough commingling of the materials without spilling from the ends. There may be as many blades provided in each set as desired; but I prefer to employ three blades to each set, or each so-called 'set' of blades could be a single continuous blade, as hereinbefore stated. The blades in two sets, as will be seen by reference to Fig. 4, are correspondingly slanted, the blades in one of these sets being indicated by the numeral 27, and the correspondingly slanted blades in the other set by the numeral 27'. There are also shown in Fig. 4 two other sets of blades which are correspondingly slanted. The blades in one of these sets are indicated by the numerals 28, and the blades in the corresponding set by the numerals 28', or, in case each so-called 'set' of blades is a continuous blade, then there will be two of said blades which will correspondingly slant in one direction and two other blades which will correspondingly slant in the opposite direction. All the blades are at the same angle, or approximately so, to the element of the cone which passes through the centers or approximately the centers of the blades. It will also be observed that, as shown in the drawings, when there is a plurality of blades in a set, each successive blade is a slight distance from the preceding blade and begins where the preceding blade leaves off, thereby forming a step by step arrangement. It will further be observed that the inner end blades of the set or the inner end of a blade, as the case may be, passes beyond the middle of the drum, whereby the mixture is thrown back and forth.

"In the operation of the machine the different ingredients of concrete—such as sand, cement, stone, and water—or the different ingredients of any other material to be formed, are fed into the drum through the feed-trough 26, and said ingredients settle in the bottom of the drum. These materials may be poured in either while the engine mechanism is stationary or is running. The engine mechanism of course will, through the connection herein shown and described, cause the drum to be rotated. If, for instance, the drum is rotating in the direction of the arrow, Fig. 4, the blades of a set as they successively pass through the material, or a single blade, as the case may be, scoop or lift up a quantity thereon. It will be supposed that the blades 28 are passing through the material. As these blades ascend, the material scooped up thereby is constantly slipping thereoff from one of said blades to the other, and after it passes off of the last blade of said set it thence flows onto the blades 27, thence from said blades 27 to the blades 28', and from blades 28' to blades 27', it being understood that the material at one period of the revolution of the drum will go through the movement just described and at other periods of the revolution will go through exactly the reverse movement as the different blades of the sets are brought into engagement with the material in the drum, so that the result is that with the continuous revolution of the drum the material is being constantly thrown from one cone-section of the drum to the other and back again, and at the same time, owing to the inclination of the different blades, the material is thrown at an angle toward the center of the drum, thereby resulting in a most thorough commingling of the ingredients, whereby the material is mixed into a homogeneous state before its discharge."

He claims a revoluble mixing drum with openings and spirally-arranged mixing blades disposed in alternate sets to deflect the material or contents from the ends toward and across the central plane alternately, and internal blades are arranged to feed from the ends toward the middle of the drum, the blades of each set stepped in a general

spiral. This patent has 47 claims, and a reading of them is conclusive in connection with the specifications that the Smith patent does not anticipate the patent in suit. This exhausts the prior art in concrete-mixing machines, and we find nothing in that art so simple, effective, and satisfactory as is the Ransome patent of 1906.

It is, however, urged that machines for mixing tea and roasting coffee are in an analogous art, and that the patent to Burns, dated November 13, 1900, No. 661,847, is an anticipation, in that it has special inclined shelves inside a rotating cylinder which aid to lift and scatter and mix the tea. To illustrate, claim 1 of that patent reads as follows:

"(1) A mixer or blender comprising a revolving drum provided with lifting blades, and a chute pivotally mounted on a stationary part independent of said drum and adapted to be moved to the outside or to the inside of said drum, to act either as an inlet or as an outlet, substantially as described."

These lifting blades are somewhat similar to those of the patent in suit, but they differ materially, and, if substituted in complainant's mixer, would fail to do the work properly or efficiently. However, I see no particular analogy between an apparatus for mixing tea and a machine for efficiently mixing concrete. At best, the Burns patent is suggestive merely, and not an anticipation.

In the Bartlett tea-mixer patent, No. 610,018, of August 30, 1898, the drum has internally projecting pallets at intervals around its circumference, each pallet extending from end to end, and each is bent at an intermediate point of its length to a wide-angled V form. It is evident that should we enlarge and strengthen one of these tea mixers, the concrete would be carried to the center of the periphery of the drum and there concentrated, and that the mixing operation would be imperfect and the discharge of the mixed concrete difficult. Ransome saw and appreciated the difficulty attending the use of the mixing devices shown in the prior art when applied to concrete mixing, and he set himself to the work of obviating or overcoming these difficulties. That he succeeded is beyond question, and I think that the device of the patent in suit discloses patentable invention of quite a high order. He certainly added something to the sum of human knowledge, and made the mixing of concrete cheaper, quicker, and much more effective. I think what he did was beyond the sphere of the work of the mechanic skilled in the art. I do not find that he was so limited by the action of the Patent Office that he is confined to the precise device or devices described and illustrated in the patent in suit.

Coming to the question of infringement, it seems to me, without going into the details of defendant's construction, that the defendant infringes. There is some change in the arrangement of the second set of shelves, but this change is so slight and immaterial that we have substantially the same action in defendant's machine that we find in the complainant's. It is obvious, I think, that the patent in suit for the first time discloses a device in the concrete-mixing art which by the same set of blades mixes and delivers the concrete. It is not necessary to stop the machine, or even slacken its movement between the mixing and the discharge operations, as the chute may be turned

into position while the drum is in full motion, and so soon as it is in position the discharge commences, and ends only with the exhaustion of the contents of the drum. There is no change or manipulation of the shelves, as they are fixed and stationary in the drum. The machine is not cumbersome or complex or liable to get out of repair, and it may be operated by a man able to handle a shovel and turn a chute on a pivot. The first machine constructed under this patent was made in 1901, and there have been large sales of the machine ever since, and they have been satisfactory to the users. A distinguishing feature of the patent in suit is the construction and arrangement of the shelves with offset portion forming pockets and the supplemental shelves, and this has been appropriated by the defendant. Infringement is not avoided by mere changes in construction when the same mode of operation is retained and the same result is attained.

After a careful consideration of all the evidence in the case, and a weighing of the conflicting opinions expressed, and a careful examination of the mixing machines of the prior art, I am satisfied that the patent in suit is valid, and that the defendant infringes.

There will be a decree accordingly, and for an accounting, with costs.